**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KEY INVESTMENT FUND | : | |
| LIMITED PARTNERSHIP XIX, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:05-CV-0997-JOF |
| | : | |
| THE URBAN PARTNERSHIP, | : | |
| L.L.C., et al., | : | |
| | : | |
| Defendants. | : | |

**OPINION AND ORDER**

This matter is before the court on Defendants' motion to compel [32-1]; Defendants' motion to compel [33-1]; Defendants' motion for summary judgment [38-1]; Defendants' motion for oral argument [43-1]; Plaintiff's motion for summary judgment [45-1]; and Defendants' motion to strike affidavits [62-1].

**I.    Background**

    **A.    Procedural History and Facts**

Plaintiff, Key Investment Fund Limited Partnership XIX, filed suit against Defendants, The Urban Partnership, L.L.C.; Norman G. Olsen, III, and Carl R. Hartrampf, III, on April 15, 2005, alleging that Defendants breached their contract with Plaintiff.   The parties engaged in

discovery and filed cross-motions for summary judgment.   The court held oral argument on the parties' motions on June 6, 2006.

The facts in this case are essentially undisputed.   Defendant The Urban Partnership LLC ("Urban") is a Georgia corporation with two members, Defendant Carl R. Hartrampf, III and Defendant Norman G. Olsen, III.   In January 2000, the parties formed a partnership called TUP V.   Urban is the general partner of TUP V.   A predecessor to Plaintiff, Key Investment Fund Limited Partnership XII ("Key XII"), was the sole original limited partner in TUP V.   Key XII's limited partnership interest was assigned in early 2000 to Plaintiff Key Investment Fund Limited Partnership XIX ("Key XIX").   For the ease of reading, the court will refer only to "Key" when discussing the limited partner in TUP V.[1]

TUP V was organized to purchase the Stonecreek Apartments in Atlanta, Georgia.   TUP V was to operate Stonecreek so that Key could claim low income housing tax credits under 26 U.S.C. § 42.   TUP V is governed by a Partnership Agreement pursuant to which Key made a cash investment of $1,365,840.   In return for this investment, Key was to receive 99.9% of the tax credits, any losses generated by the project, and 20% of any net revenue.   The parties estimated that up to $1,861,070 in tax credits would become available from the project.   *See* Partnership Agreement, Appendix 1.

---

[1]The court notes that at some point in the litigation, Defendants contested the assignment of Key XII's rights in the contract to Key XIX.   Defendants, however, have abandoned this argument.

The Agreement set forth numerous rules governing the operation of the housing complex, including the Operating Deficit Guarantee.  This guaranty provides:

> The General Partner shall provide funds to the Partnership in an amount up to the Operating Guaranty Amount for Operating Deficits occurring during the Operating Guaranty Period.   Repayment of any letters of credit or other borrowings arranged by the General Partner in furtherance of its obligations under this § 5.4(h) shall be the sole obligation of the General Partner.   Funds made available by the General Partner pursuant to this § 5.4(h) shall be treated as loans to the Partnership which are repayable as provided in § 4.1 and § 4.2 hereof, and which shall not bear interest.  The Guarantors have guaranteed the obligations of the General Partner under this § 5.4(h).

Partnership Agreement, § 5.4(h).   Under the Operating Deficit Guarantee, Urban, Hartrampf, and Olsen were required to contribute up to $567,000 to fund any monthly operating deficits at Stonecreek for three years after the date of initial "Breakeven Operations."   The Operating Deficit Guarantee expired in May 2003, although Urban, Hartrampf, and Olsen continued to provide funds to Stonecreek for numerous months thereafter.

TUP V purchased the Stonecreek Apartments in January 2000.   Thereafter, structural deficiencies were noted in the property, and additional funds were needed for these repairs so that Stonecreek could attract the number of tenants necessary to generate sufficient revenue to pay Urban's note obligations.[2]   During 2003 and 2004, Hartrampf and Olsen

---

[2]The note on the Stonecreek property was originally held by WMF Washington Mutual but was later obtained by Fannie Mae.  Fannie Mae also was to be the ultimate recipient of the tax credits spun off by the project through Key.  Thus, to a certain extent, Fannie Mae was on both ends of this deal.  Defendants take pains to emphasize this fact, but the court finds that it is not relevant to any of the legal questions at issue in this litigation.

3

communicated with the Key entities concerning the money that would be needed to make the necessary repairs.  They also asked Key to use its contacts with Fannie Mae to try to persuade Fannie Mae to modify Urban's loan.   The Key entities, however, did not provide additional funds and did not assist Urban with Fannie Mae.   In the fall of 2004, Fannie Mae issued a notice of default and intent to foreclose.   Although Defendants requested, Plaintiff did not give authorization for the filing of a petition of bankruptcy.   Fannie Mae eventually foreclosed on the property on January 5, 2005, thereby ending the stream of tax credits flowing from the property.

Section 5.10(c) of the Partnership Agreement provides:

**Material Credit Shortfall**.  If, . . . the Actual Tax Credits are, on a cumulative basis, less than the cumulative Projected Tax Credits through the close of such fiscal year; or (ii) the Limited Partner is required to recapture . . . all or any part of the Tax Credits claimed by it in any prior fiscal year of the Partnership, then the Partnership shall be obligated to pay to the Limited Partner the amount necessary . . . to preserve the anticipated ratio of Capital Contributions to Tax Credits determined by dividing the total Capital Contributions contributed by the Limited Partner . . . by the Projected Tax Credits ("Credit Contribution Ratio").   The amount payable to the Limited Partner hereunder shall be determined by multiplying the Credit Contribution Ratio by the sum of (I) the difference between the cumulative Projected Tax Credits for the fiscal year and the cumulative Actual Tax Credits for such fiscal year; and (II) the amount of the Tax Credits claimed in prior fiscal years recaptured in such fiscal year plus interest payable thereon.  . . [3]  The Guarantors have guaranteed the obligations of the General Partner hereunder.   No payment shall be due hereunder for any

---

[3]A "recapture obligation" is triggered under federal income tax regulations when a property ceases to be in compliance with program requirements within fifteen years of the date credits were first claimed.   Under those circumstances, the taxpayer who claimed those credits is required to disgorge a portion of them.

4

> reduction or recapture of Projected Tax Credits attributable to actions or
> omissions of the Limited Partner, or to changes in federal income tax law.  . .
> .

*Id.*, § 5.10(c).  The parties refer to this provision as a liquidated damages clause.  That is, if

the actual tax credits are less than the projected credits or if Key is required to recapture any

part of the tax credits claimed by it in a previous fiscal year, Urban is obligated to compensate

Key.   Defendants Olsen and Hartrampf executed a Guaranty Agreement under which they

agreed *inter alia* to guaranty Urban's obligations to Key under § 5.10(c).  Defendants do not

contest the terms of the Guaranty Agreement.

"Projected Tax Credits" is defined in Appendix I of the Partnership Agreement as "70%

present value tax credits in the following amounts:   (I) $170,427 for taxable year 2000; (ii)

$185,921 for taxable years 2001-2007; (iii) $76,305 for the year 2008; and (iv) $28,602 for

taxable years 2009-2012."  *See* Appendix I, at 7.

Scott Stanley and Clark Rogers provided affidavits to support Plaintiff's damages

claim.   Mr. Stanley is a Vice President of Key Affordable Housing Corp.   *See* Stanley Aff.,

¶ 2.    Mr. Stanley provided testimony and an exhibit demonstrating his calculation of the

amount payable to Key under § 5.10(c).  *Id.*, ¶ 5.  Mr. Stanley first determined the amount by

which the Actual Tax Credit would fall below the Projected Tax Credits.  *Id.*, ¶ 6.  Because of

the foreclosure, Mr. Stanley determined that Key would not receive tax credits for the years

2005 through 2012.  *Id.*  Using the Projected Tax Credit definition set forth by the parties in

Appendix I to the Partnership Agreement, Mr. Stanley determined that the loss of tax credits

for those years would be $747,765.  *Id.*  Mr. Stanley calculated that the "recapture" for tax credits previously taken would be in the amount of $304,419.  *Id.*[4]  Mr. Stanley then applied the next portion of § 5.10(c), which involves the Credit Contribution Ratio.  *Id.*  The parties inserted this ratio calculation because Plaintiff invested approximately $1.3 million in hopes of a return of $1.6 million in tax credits.  The Credit Contribution Ratio, therefore, is .8223.  *Id.*, ¶ 7.  Multiplying the loss by the ratio, Mr. Stanley testified that the figure due to Plaintiff under § 5.10(c) was $935,148.  *Id.*, ¶ 8.

Mr. Rogers is the Senior Vice President of Key Affordable Housing Corp., the general partner of Key.  Mr. Rogers testified that under the terms of the Partnership Agreement, Key was to receive 99.9% of the tax credits.  *See* Rogers Aff., ¶ 5.  The estimated tax credits were defined as "Projected Tax Credits."  *Id.*, ¶ 6.  Section 5.10(c) of the Partnership Agreement defined what would happen if the Actual Tax Credits did not meet the Projected Tax Credits.  *Id.*, ¶¶ 8-11.  As a result of the foreclosure, Mr. Rogers testifies that Key will not be able to take $ 747,765 of tax credits for years 2005 through 2012.  *Id.*, ¶ 14.  He also testified that Key will suffer recapture of $304,419 of tax credits taken in previous years.  *Id.*[5]

**B.    Contentions**

---

[4]Mr. Stanley also stated that Key would suffer interest penalties in the amount of $85,000.  However, Plaintiff's counsel withdrew the request for interest penalty at oral argument.

[5]As Mr. Stanley did, Mr. Rogers also included a calculation for interest which Plaintiff has withdrawn.

AO 72A
(Rev.8/82)

The parties have filed cross-motions for summary judgment. With respect to the question of liability, Plaintiff contends that Defendants breached the Partnership Agreement because the property in question was foreclosed upon eliminating any tax credits that Plaintiff could receive and incurring a recoupment penalty for past deductions taken by Plaintiff. Plaintiff also contends that Defendants Olsen and Hartrampf are liable to Plaintiff through the Guaranty Agreement they signed with Plaintiff. Plaintiff avers that, applying the formula described in § 5.10(c), it is owed $935,148.

Defendants respond that they are not liable under the Partnership Agreement because the Agreement provides that they are not responsible if the loss of the tax credits was caused by some action of Plaintiff. Defendants claim that Plaintiff had the opportunity to provide further funding for the housing project and had they done that, the foreclosure would not have occurred and the flow of tax credits would have continued. Defendants also assert that Plaintiff also could have arranged for assistance from the holder of the mortgage note or approved a bankruptcy application, all of which, Defendants believe, would have maintained the tax credits.

As to damages, Defendants contend that the liquidated damages provision of § 5.10(c) does not comport with Georgia law and therefore cannot act as the measure of damages. Defendants further aver that Plaintiff has not provided any competent testimony as to the proper measure of damages. Plaintiff responds that § 5.10(c) is a fair measurement of what the parties estimated would be damages in the event that Plaintiff was not able to secure the

expected tax credits. Plaintiff also avers that its officers are competent to testify as to the amount of damages.

## II.  Discussion

### A.      Liability for Breach of Contract

#### 1.       Section 5.4(h)

Defendants first argue that the court must read the Material Credit Shortfall provision of § 5.10(c) in conjunction with the Operating Deficit Guaranty of § 5.4(h). Reading these two provisions together, Defendants argue that their obligation to the partnership was only for the Operating Deficit Guaranty period which expired in May 2003. "After the expiration of the ODG, it became the Limited Partner's duty and obligation to inject additional funds into the partnership – or suffer the consequences of that failure (*i.e.* potential loss of tax credits)." Defendants' Motion, at 8. Defendants, however, point to no provision of the Partnership Agreement to support this interpretation. Defendants concede this point stating that "[w]hile Key XIX was not required to make those contributions as a condition of the agreement (*i.e.* Key XIX's failure would not constitute an independent breach), there was a consequence associated with the failure to support the limited partnership – namely, the potential loss of the tax credits." *Id.* at 9-10. Viewing the contract in its entirety, however, the court finds there is no logical reason to pair § 5.10(c) with § 5.4(h). They are independent of one another. For that reason, the court finds no basis in the Partnership Agreement for finding that Defendants' obligations under the Agreement ceased after May 2003.

8

2.    Section 5.10(c)

Defendants next contend that the "acts or omissions" language in § 5.10(c) was intended by the parties to "limit Defendants' obligations to tax credit losses caused by Defendants' own wrongful conduct.  Defendants would not be responsible for the loss of tax credits caused by simple economic failure of the project, absent fraud or misfeasance." Defendants' Motion at 10.   Thus, Defendants argue, Plaintiff's failure to (1) use its influence with Fannie Mae to seek relief, (2) contribute additional funds, (3) authorize a bankruptcy filing, or (4) take any other action to prevent a foreclosure, constitutes "acts or omissions" of Plaintiff which relieve Defendants from liability for the failure of the project to generate tax credits.

The court finds, however, that this contractual provision cannot bear the weight placed on it by Defendants' arguments.  Nowhere in the contract is any language which evidences an agreement among the parties to limit Defendants' liability to circumstances of its own wrongful conduct.   Nowhere in the Agreement is any language which evidences Plaintiff's intent to assume the risk of "simple economic failure of the project."   What is before the court is a contract whereby Plaintiff makes a capital investment in a real estate project of over $1,000,000, and in return receives the benefit of tax credits spun off by the project.   In contrast, the Agreement contains six and one-half pages of "representations, warranties, and covenants" of Defendant Urban, the General Partner of the project, *see* Agreement, § 5.3, as well as four additional pages of "specific obligations" of the General Partner.   *Id.*, § 5.4.   It

9

defies reason to assert that one sentence in § 5.10(c) obligates Plaintiff to assume the economic risk of the venture.

Furthermore, there is no evidence in the record that any of the acts Defendants believe Plaintiff should have taken to prevent foreclosure would have been successful. Therefore, the failure to undertake these acts cannot be seen as the cause of the foreclosure. Specifically, Defendants argue Plaintiff had some influence with Fannie Mae because other Key entities were in partnership with Fannie Mae and could have asked Fannie Mae for some relief from the situation. Even had Plaintiff taken this action, however, there is no assurance that Fannie Mae would have complied with Plaintiff's request and provided relief under the terms of the mortgage note.

Similarly, Defendants aver that Plaintiff refused to authorize a bankruptcy filing which would have delayed foreclosure and assured the stream of tax credits for an additional period of time. Even assuming that Plaintiff's authorization was necessary, Defendants cannot demonstrate that had Plaintiff authorized a Chapter 11 proceeding, the stream of tax credits would have flowed uninterrupted for the period of the contract. A mere "delay" of the foreclosure would not assist Defendants here because § 5.10(c) also obligated them to compensate for any recapture of tax credits previously taken if the property did not operate as low income housing for the designated period of years. Finally, Defendants never proposed any kind of work-out plan to Plaintiff. Thus, there is no evidence in the record that a bankruptcy plan was anything more than mere speculation.

Finally, Defendants argue that they are not liable under the Partnership Agreement because Plaintiff refused to contribute additional funds to the project. Defendants, however, can point to no provision in the Agreement which requires Defendants to provide additional funds beyond its initial $1.3 million investment.[6]   Furthermore, Defendants have proffered no testimony to show that had more money been placed into the property, foreclosure would not have happened. For example, at oral argument, Defendants proffered that the occupancy rate at the time of foreclosure was 88 % and dropping, but Defendants admitted that there was no evidence in the record to show what occupancy rate would be necessary to generate sufficient funds to pay the mortgage note, nor what amount of money would be required to attract that number of occupants.

Because the court rejects Defendants' argument that (1) their obligations to provide tax credits ceased in May 2003 and (2) Plaintiff's own acts and omissions caused the disruption of the tax credits, the court finds that Defendants have breached the Partnership Agreement with Plaintiff. The court next turns to damages.

**B.     Calculation of Damages**

      1.     <u>Liquidated Damages</u>

---

[6]Defendants point to deposition testimony indicating that Key intended to stretch out the project to get credits as long as possible and that once Key determined that the property was not going to work as a housing project, Key needed to position itself from the beginning as if it were going to lose the property and later sue the Guarantors for damages. These may be tough business tactics, but Defendants have not pointed to any provision of the Agreement these decisions violate.

Defendants contend that the liquidated damages clause of § 5.10(c) is not valid because the damages suffered by Plaintiff would not be difficult to estimate and because the formula in § 5.10(c) is not a reasonable pre-estimate of probable loss and yields damages greater than the actual losses suffered by Plaintiff. The enforceability of a liquidated damages provision is a question of law. *See Liberty Life Ins. Co. v. Thomas B. Hartley Construction Co.*, 258 Ga. 808, 809 (1989). While the burden is upon the defaulting party to show a liquidated damages provision is actually a penalty, at the summary judgment stage, the moving party must first demonstrate that no genuine issue of material fact exists as to the three-pronged test for liquidated damages set forth in *Southeastern Land Fund, Inc. v. Real Estate World, Inc.*, 237 Ga. 227 (1976). In *Southeastern Land Fund*, the Georgia Supreme Court promulgated the following three factors as the test of a liquidated damages provision: "First, the injury caused by the breach must be difficult or impossible of accurate estimation; second, the parties must intend to provide for damages rather than for a penalty; and third, the sum stipulated must be a reasonable pre-estimate of the probable loss." *Id.* at 230.

Defendants challenge the liquidated damages provision in the Partnership Agreement based on their theory of damages in the case. Various Key entities are in a contractual relationship with Fannie Mae, the details of which are not relevant to this argument. Defendants contend that part of this relationship guarantees Fannie Mae a 5.8 % return on its investment with the Key entities. As part of this arrangement, Key also passes the tax credits received from the Partnership Agreement to Fannie Mae. Therefore, Defendants argue that

12

the true measure of damages suffered by Plaintiff is the degree to which Plaintiff could not meet the guaranteed 5.8 % return on investment it made to Fannie Mae due to the failure of the Stonecreek project to spin off the projected tax credits.   Defendants show that in November 2004, Key Affordable Housing Corporation determined that it would need to inject $558,000 into Key in order to maintain the return ratio guarantee to Fannie Mae.   Defendants aver that so long as Plaintiff could make up the tax credits lost on Stonecreek through one of the other properties in the fund operated by the Key entities, it suffered no loss due to Stonecreek's foreclosure.

The court disagrees.   Plaintiff made a contract with Defendants for tax credits in return for investment.   Plaintiff is damaged to the extent those tax credits fail to materialize.   It matters not that the Key entities may or may not have other properties which could "make up" the loss of tax credits from Stonecreek.   In addition to the fact that the record in this case is silent as to what those other properties would be, the simple fact of the matter is that the Partnership Agreement is at issue in this case, not whatever contractual arrangements Key has made with Fannie Mae.   With this context in mind, the court proceeds to discuss the three *Southeastern Land Fund* factors.

Here, at the time of contract formation, the parties agreed upon an estimate of Projected Tax Credits and set forth those figures in an Appendix to the Partnership Agreement.   Other than the theory set forth above and rejected by the court, Defendants have made no argument that the calculations of the Projected Tax Credits were faulty in any way.

13

Section 5.10(c) then works from the Projected Tax Credits and subtracts the actual tax credits taken by Plaintiff.   Finally, that difference is multiplied by a ratio which compares the investment made by Plaintiff with the expected return.   The court finds that such a tailored calculation clearly is a reasonable pre-estimate of the probable loss.   Further, there is nothing in that calculation which has any indicia of a penalty; thus, the second prong is satisfied.

The court next considers whether the injury caused by the breach of the Partnership Agreement would be difficult to accurately estimate.   Defendants' only argument with respect to this prong of the *Southeastern Land Fund* factors is the November 2004 Key Affordable Housing Corporation estimate that it would need to provide $558,000 to Key in order to maintain the 5.8 % investment guaranty given to Fannie Mae.   The court has rejected that theory, however, and Defendants make no other contention.   Further, at oral argument, Defendants, themselves, contended that the loss of the tax credit would not be a simple calculation because it depended on the other tax circumstances of the party taking the tax credit.   The parties also discussed the fact that a "market" existed for tax credits, but that it would be difficult to establish the "fair market value" of the tax credits at any particular time. Particularly in light of no other argument from Defendants, these circumstances indicate to the court that the calculation of the actual worth of the tax credits to Key would be difficult to accurately estimate.

For the foregoing reasons, therefore, the court finds that § 5.10(c) is an enforceable liquidated damages clause.

14

2.   <u>Acceleration</u>

Defendants next contend that even if § 5.10(c) is valid, the damages for each year only accrue at the end of that individual year because under § 3.3 of the Partnership Agreement, Defendants must provide the benefit of the tax credits to Plaintiff by December 31.   *Id.* Because there is no acceleration clause in the Partnership Agreement, Defendants argue this obligation arises each year under the term of the contract; thus, Plaintiff must sue each year for the tax credits not provided by December 31.[7]   Plaintiff responds that Defendants have repudiated the contract, thereby allowing an acceleration of the damages.

"A repudiation is a manifestation by one party to another that the first cannot or will not perform at least some of its obligations under the contract."   Farnsworth, Contracts, § 8.21, at 662 (2d ed. 1990).   "A repudiation may be by words or other conduct."   *Id.*, § 8.21, at 662.   As a general rule, "an anticipatory repudiation gives the injured party an immediate claim to damages for total breach . . . ."   *Id.*, § 8.20, at 658-59; *see also J.M. Clayton Co. v. Martin*, 177 Ga. App. 228 (1985).

Plaintiff contends that Defendants have repudiated the Partnership Agreement because Defendants argue that their obligation under § 5.10(c) expired at the same time the Operating

---

[7]Defendants also contend that the loss of the credits may only be "temporary."   *See* Defendants' Mot. for S.J., at 5.   However, there is no evidence in the record to show that the Stonecreek property would continue to operate as a low income housing project under its new ownership or that Plaintiff had any other property which could "substitute" for the tax credits that were to accrue from the Stonecreek property.

AO 72A
(Rev.8/82)

Deficit Guaranty under § 5.4(h) expired in May 2003.  The court in *Continental Casualty Co. v. Stephenson*, 112 Ga. App. 666 (1965), however, rejected a similar argument.  There, an insurance company discontinued payments under a disability policy contending that the insured was not permanently disabled.  The court held that the "breach which will form the basis for [a claim of anticipatory repudiation] is an unqualified repudiation of the entire contract prior to the time for performance."  *Id.* at 667.  Because the insurance company's refusal to pay was based on its belief that the insured was not disabled and not based on a repudiation or denial of the validity of the contract, the court held there was no anticipatory repudiation.  *Id.*

Plaintiff also contends that Defendants have repudiated the contract because they cannot perform their obligations under the contract due to the foreclosure.  The court finds this argument more persuasive.  There is no dispute that Fannie Mae foreclosed on the Stonecreek property and that TUP V no longer owns the property.  Defendants have provided only speculation that another property might be acquired to "make up" for the loss of tax credits from Stonecreek.  Thus, the court concludes that Defendants cannot perform at least some of their obligations under the contract, and under a theory of anticipatory repudiation, Plaintiff is entitled to claim damages for the entire breach.

       3.    <u>Admissibility</u>

Defendants filed a motion to strike the affidavits of Mr. Rogers and Mr. Stanley which evidence Plaintiff's calculation of damages.  Specifically, Defendants argue that the affidavits

16

are unsworn, not based upon personal knowledge, and are speculative and conclusory. Plaintiff responds that it has updated the affidavits to contain the proper swearing. Furthermore, Plaintiff argues that the affidavits simply take the formula set forth in the Partnership Agreement and apply the Projected Tax Credits laid out in Appendix I to the Partnership Agreement to reach a calculation of damages.

On a motion for summary judgment, the court may consider any evidence that could be reduced to admissible form at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Because Plaintiff has now provided sworn affidavits with all exhibits attached, the court will not consider further this argument. Furthermore, in general, the owner of a property or business is competent to provide an opinion as to the valuation of aspects of the business. *See generally Getz Services, Inc. v. Perloe*, 173 Ga. App. 532, 536-37 (1985). The court now turns to the specific objections raised by Defendants.

Defendants ask the court to strike paragraph 13 of Mr. Rogers' affidavit where he states that because of the foreclosure, the partnership is no longer entitled to tax credits and will suffer a recapture. Defendants contend that these are conclusory statements about future events and Mr. Rogers is not competent to testify as to a matter of federal income tax law. The fact that the foreclosure on the Stonecreek property halted the stream of tax credits and that the Internal Revenue Code contains a recapture provision are not intricacies of law requiring expert opinion. In fact, the court found above that this was undisputed without reference to Mr. Rogers' affidavit..

17

In paragraph 14 of Mr. Rogers' affidavit, he states that the projected tax credits for years 2005 through 2012 were allocated as $747,765.  He also calculated the recapture amount to be $304,419.  The Projected Tax Credits were set forth by the parties in Appendix I to the Partnership Agreement.  Mr. Rogers certainly has personal knowledge of that number, and it requires no speculation or particular competence to extract that number from the Appendix.

The recapture involves the tax credits taken for years 2000 through 2004 which are no longer eligible under 26 U.S.C. § 42.  According to Exhibit 1 of Mr. Stanley's affidavit, the total of tax credits taken for those years was $913,258.  Exhibit 1 shows that Mr. Stanley then took one-third of that amount to reach a recapture figure of $304,419.  Defendants are correct that neither Mr. Rogers nor Mr. Stanley explained how they determined that one-third of the recapture was the appropriate amount for a damages calculation.  However, Defendants did not provide any alternative for the manner in which the recapture should have been calculated.  Nor have Defendants demonstrated that Mr. Rogers or Mr. Stanley, as officers of Key, would not be competent to testify as to the recapture figure.[8]

Defendants challenge Mr. Stanley's calculation of damages, asserting that there is no "basis for the claim that future tax credits will not be provided by TUP V."  *See* Motion to

---

[8]Paragraph 15 of Mr. Rogers' affidavit asserts that because of the foreclosure, the Partnership will not be able to satisfy the material credit shortfall.  Because this assertion is not relevant to the legal determinations reached by the court, the court denies as moot Defendants' challenge to this paragraph.

18

Strike, at 9.  Again, the court has held above that the Partnership Agreement was a contract whereby Plaintiff provided $1.3 million in cash investment and Defendants in return were to provide approximately $1.6 million in tax credits.  Clearly, the foreclosure halted the tax credits, and there is nothing in the record to show that TUP V has made, will make, or can make any efforts to spin off future tax credits.  Mr. Stanley's testimony was not necessary to reach this conclusion.  Furthermore, the court has addressed above with respect to Mr. Rogers' testimony the other similar challenges Defendants make to Mr. Stanley's testimony concerning the calculation of damages.

        For the foregoing reasons, the court finds that Defendants are liable for breaching the Partnership Agreement, that the liquidated damages clause is valid, and that Plaintiff has provided admissible evidence as to the amount of those damages.  At oral argument, however, Plaintiff withdrew its claim for interest.  Thus, in adjusting Mr. Stanley's calculations, the court finds $747,765 in lost tax credits plus $304,419 in recapture for a total of $1,052,184.  Applying the Credit Contribution Ratio of .8223, the court finds total damages of $865,211.  The court realizes that Plaintiff requested other forms of damage in its complaint.  However, the only evidence concerning damages proffered by Plaintiff is through the affidavits of Messrs. Rogers and Stanley.  Thus, the court awards damages only as to the Material Credit Shortfall provision of § 5.10(c).  The court DENIES Defendants' motion for summary judgment [38-1]; GRANTS Defendants' motion for oral argument [43-1]; GRANTS Plaintiff's

19

motion for summary judgment [45-1]; and DENIES Defendants' motion to strike affidavits [62-1].

### C.      Motions to Compel

Defendants filed two motions to compel.   In the first, Defendants argue *inter alia* that Key has not fully responded to their discovery requests concerning Key's recapture obligation, partnership meeting minutes, and Plaintiff's consideration of bankruptcy proceedings.   Plaintiff responds that it has produced all requested material and has indicated to Defendants where no documents exist to produce.   Defendants did not contest this assertion.

Furthermore, the Local Rules of this court set forth the manner in which motions to compel are to be presented to the court.   Specifically, Local Rule 37.1 requires that a motion to compel, among other things:   quote verbatim the interrogatory or production request objected to; state the specific objection raised by the non-complying party; state the grounds assigned for the objection; and cite authority and include a discussion supporting the motion. See LR 37.1A(1)-(5), N.D. Ga.   Additionally, "[t]he motion shall be arranged so that the objection, grounds, authority, and supporting reasons follow the verbatim statement of each specific [discovery request] to which an objection is raised." LR 37.1A, N.D. Ga.   Defendants have not complied with this local rule.   Therefore, the court DENIES Defendants' motion to compel [33-1].

20

Defendants also filed a motion to compel concerning a subpoena issued to Fannie Mae. The court notes that this motion to compel also fails to comply with the court's Local Rules. Defendants argue that information from Fannie Mae is relevant because Fannie Mae was both a mortgage lender and a beneficiary of the tax credits. Defendants recognized, however, that the parties were working toward reaching an agreement on the discovery issues, but that in light of the imminent close of discovery, Defendants desired to preserve their rights by filing the motion to compel. Fannie Mae responds that it has provided Defendants with the documents requested under the subpoena and has provided a Rule 30(b)(6) representative to sit for a deposition. Defendants do not dispute this characterization. Furthermore, Defendants did not contend to the court at oral argument that they were unable adequately to respond to Plaintiff's arguments on summary judgment because they did not have sufficient discovery. For these reasons, the court DENIES AS MOOT Defendants' motion to compel [32-1].

## III.    Conclusion

The court DENIES AS MOOT Defendants' motion to compel [32-1]; DENIES Defendants' motion to compel [33-1]; DENIES Defendants' motion for summary judgment [38-1]; GRANTS Defendants' motion for oral argument [43-1]; GRANTS Plaintiff's motion for summary judgment [45-1]; and DENIES Defendants' motion to strike affidavits [62-1].

Defendants are DIRECTED to pay to Plaintiff the amount of $865,211.

21

**IT IS SO ORDERED** this 22nd day of August 2006.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

22